## Case No. 6,042.

### HANSON v. FOWLE et al.

[1 Sawy. 539.][1]

District Court, D. Oregon. April 3, 1871.

SEAMEN — ASSAULT AND BATTERY OF OFFICER — WHEN MASTER LIABLE FOR — SATISFACTION, PROOF OF—RECEIPT FOR CLAIMS EX CONTRACTU AND CLAIMS EX DELICTO—MEASURE OF DAMAGES.

1. A master of a vessel is liable for an unjustifiable assault and battery by one of his officers upon one of the crew, when the same is done by his connivance, consent or authority.

2. The consent and authority of the master will be presumed when it appears that he knew of the trespass or had reason to know it, and did not interfere to prevent it.

3. A receipt given by a seaman upon the payment of his wages, which contains a clause acknowledging satisfaction of all claims for assault and battery, is not binding unless shown to have been the result of a fair and free compromise or settlement for some substantial compensation or benefit to the seaman besides the payment of his wages.

[Cited in The Oriflamme, Case No. 10,572.]

4. A receipt for all "demands and dues" against a vessel, her master and officers, is not upon its face a receipt for assault and battery.

5. The word "demand" on a receipt ordinarily relates only to claims arising ex contractu, and not to those arising ex delicto.

6. Rules for assessment of damages in cases of beating and wounding a seaman.

In admiralty.

Theodore Burmeister and H. Y. Thompson, for libellant.

J. W. Whalley, for defendant Turner.

Orlando Humason, for defendant Fowle.

DEADY, District Judge. Christian Hanson, lately a seaman and second mate on the American brig Madawaska, brings this suit against the respondents, the master and mate of said brig, to recover damages for an alleged beating and wounding by the latter, with the consent of the former, about August 8, 1870, during a voyage from Newport, Wales, to Portland, Oregon.

The libellant and the respondents have been examined as witnesses, also two of the seamen, and the cook and the cabin boy. The arm of the libellant, which it is alleged was fractured by the beating, was exhibited in court, and the testimony of physicians heard as to the nature of the injury and its probable cause and consequences.

The testimony is too voluminous to be detailed here. It appears that when the brig was in the South Atlantic, the libellant was at the wheel during the morning watch, steering by the wind, the same being light and varying about five points on either side. Near six o'clock the ship was thrown into stays, but no harm was done by it except the stranding of the main sheet, which was not discovered, however, until after the beating in question. When the ship was thrown into

[1] [Reported by L. S. B. Sawyer, Esq., and here reprinted by permission.]

stays, the master came on deck, and abused Hanson on account of it. Hanson replied that he couldn't help it. The mate immediately with the rest of the watch, braced the yards on the other tack, and then went forward with one man to haul down the foretack. Just at this time—near six o'clock—the libellant's watch at the wheel being about out, the master ordered O'Neal to take the wheel, and the libellant to go forward and help the mate about the foretack. As soon as the libellant got forward near the capstan, words passed between the mate and him about the ship being thrown into stays—the mate abusing the libellant, and finding fault with him about it, and the latter answering, "Mr. Turner, I couldn't help it." Very soon the mate commenced beating the libellant, and knocked him down near or on the combing of the fore hatch and then kicked—booted him—aft to the companion way.

The libellant testifies that the mate struck him six times with a capstan bar. That the first three blows he received on his arm in attempting to ward them off from his head and body, and that then he was knocked down and struck on the lower part of the back three other blows with the bar. That then the mate ordered him aft, and as he went stooping along from the effect of the blows, on his two feet and one hand, the mate kicked him in the back and sides until he reached the companion-way where the master was standing.

The mate denies having struck the libellant with the bar, but admits striking him with his fist and knocking him down, and that he kicked him with his bare foot, and also struck him with his fist as he passed him as they were both going aft. The mate also testifies that the libellant was impudent to him and pushed him against the anchor, and that he was provoked to beat him on that account. No one saw the men during the affray at the capstan, but the libellant was heard to scream and say, "I couldn't help it." There is no doubt but that his arm was broken on that occasion, and the weight of testimony tends to support the story of the libellant. This being so, the beating was unprovoked and unjustifiable. It does not, however, necessarily follow that the mate intended to break libellant's arm, but he beat him unlawfully and, I think, unmercifully, and he must be held responsible for the consequences of his conduct and actions.

The master denies knowing anything about the matter, or that he had any knowledge that the libellant was injured while on the vessel. I think the testimony strongly preponderates in favor of the conclusion that the master was cognizant of the beating, and did not interfere to prevent it but on the contrary, suffered and approved it. Notwithstanding the attempt to prove the contrary, I am satisfied that the master was on deck, probably on the poop, at the time. True, on account of the ship's house, he might not have seen the parties at the time libellant was knocked down and had his arm broken, but he must have heard enough of the affray then to have called his attention to it. At least, as the libellant came aft crying with pain, and the mate booting him, he must have seen them. Besides, it is admitted that the master came on deck immediately after the libellant and mate came aft, and that he saw the former crying from the effects of the beating, and that he made no inquiry into the matter nor noticed it otherwise than to put him to work splicing a thimble in the main sheet, and when he complained that his arm hurt him so he could not work, to tell him "to shut up."

There can be no doubt that the libellant carried his arm in a sling for several weeks, probably as many as six, during which time, although he stood his watch, he did not take his turn at the wheel on account of the fracture of his arm.

The voyage did not terminate for near five months afterwards, and yet no inquiry was ever made into the matter by the master, and the broken arm was allowed to go uncared for and to heal as best it might.

This subsequent utter indifference and neglect on the part of the master tends to convince me that he was aware of the beating when it occurred and approved it. Indeed it is not improbable that he sent the libellant forward to where the mate was when he did, for the purpose of giving the latter an opportunity of punishing the former for letting the ship come into stays. The testimony of one witness is that he was walking the poop cursing and swearing about the matter, at the time the battery was being committed. According to the libellant's testimony, as soon as the master came on deck he railed out at him, calling him a "Dutch hound of h—ll." So the testimony of others of the crew is to the effect that he was in the habit of telling the mate "to make the men move, and if they didn't, to mash their heads," and that on one occasion he beat one of the men himself over the back with a broom-stick, for no particular cause as appears.

The law upon the liability of the master for the trespasses of his officers is laid down by Mr. Justice Story in Thomas v. Lane [Case No. 13,902] as follows: "The master has the supreme authority on board of his ship; and has, moreover, a sort of parental responsibility and duty devolved upon him, for the due exercise of it. It is his duty to prevent, as far as he may, any undue exercise of authority by his subordinate officers, and any abuses, injuries and trespasses by them. If he is present when any of the subordinate officers inflict chastisement upon the crew, he is bound in duty to interfere, and restrain it, if it is improper in its nature or character, or unjustifiable under the circumstances. If he may interfere, and he does not, he must be deemed to assent to and encourage it; for no officer in his presence has any right to inflict punishment without his assent or direction,

unless upon an emergency, which admits of no delay. It is not sufficient for him to excuse himself from this interposition, upon any notions of courtesy, or of upholding the authority of the officers, or of supporting the harmony and discipline of the ship. The law has entrusted him with summary powers, for the good, not of the officers alone, but of the crew also, and, indeed, for the general good of the maritime service, in which he is engaged. While he should uphold the just discipline of the ship with a steady confidence, he is to take care that the crew is not made the victims of the insolence, the passions, or the caprice of the officers under him. If he will stand by and see the seamen cruelly, brutally and unjustifiably beaten without interference, he ought not to complain that the law forces upon him the conclusion that he approves what is done, and means to encourage it by his license and authority. He becomes thereby the abettor and supporter of the deed, upon the reasonable ground that he who knowingly allows oppression shares the crime. Such, in my opinion, is the dictate of the law on the subject; and it is wholesome as an admonition and a preventive against the undue resentment and oppression of officers, which so often end in the open mutiny and rebellion of the injured crew."

Upon this branch of the case I think the libellant is entitled to recover against the master as well as the mate. To my mind, it is absurd to suppose that within the limited area of this vessel, carrying a crew of only six men, that the mate could in open daylight and without any substantial cause, severely beat one of the men, fracture his arm, and boot him from fore to aft, without the master being aware of it at the time or soon after. If for any reason he did not see the transaction at the moment of its occurrence, and it had not been allowed to take place by his connivance, consent or authority, he would most naturally inquire into the circumstances as soon as the matter came to his knowledge and take some steps to rebuke or punish the offending officer, and to bind up and heal the wounds of the injured seaman. Not having done this, the inference is reasonable that he approved of the mate's conduct at the time.

An attempt is made in the pleadings and proof by both respondents to set up a receipt given by the libellant to the master one or two days after the arrival of the vessel at this port, in bar of this suit. It is in these words. "Received from F. Fowle, the sum $93.96, being the amount in full of all demands and dues against brig Madawaska, her officers, captain and owners. (Signed) Christian Hanson. Portland, January 17, 1871."

There is no direct testimony to show that the sum mentioned in this receipt was paid the libellant for his wages only, but the fact is manifest from all the circumstances as well as from the testimony of the master himself. He testifies that within a day or

two after his arrival at this port, he sent for the men to pay them off, and that the libellant was the first man in the cabin. "I (the master) asked him (Hanson) if he had made up his account? He said he had not. I told him I had, and read it to him, and asked him if it was right. He said it is. Then I gave him the money, and he signed the receipt." On cross-examination, he testified further: "I did not suppose there would be any claim for damages. I did not think of anything of the kind at the time."

The general rule is that the word "demand" in a receipt relates only to claims arising out of contract, and does not include those arising out of tort, such as this. The word "damages" nor any equivalent of it, does not occur in the receipt, and the master did not think of any such a thing when he took it. Upon these facts alone it would not be held to be a release or acquittance of this claim. But this is not all. This voyage lasted seven months and twelve days. The only place that the vessel touched on the way was the Falkland Isles, where she remained a few days to ship three men in place of three of the crew lost overboard. It is highly probable that the whole wages for the voyage were due the libellant when he signed this receipt. Dividing the sum received by the time of his voyage, gives as a result, a little over $13 per month. It is not probable that the wages were less than this sum. Considering these facts, the nature of the subject, and the relation of the parties, it is apparent that the receipt was neither given by the libellant, or received by the master with any reference to this claim for damages.

But if this receipt contained the word "damages," or "all claims for damages," the law would not allow the respondents to take advantage of it to defeat this suit, unless it also satisfactorily appeared that after a fair and distinct understanding of the matter, the libellant compromised or settled the claim for, or on account of some substantial satisfaction, compensation or benefit made to, or to enure to him.

The law very properly looks with distrust and suspicion upon a release or receipt obtained from a seaman at or before the payment of his wages, for injuries inflicted upon him during the voyage. While the wages are unpaid, the master and men deal upon such an unequal footing, that no attention will be paid to such release when there is any ground for suspecting that it was unduly or unfairly obtained.

In Whitney v. Eagar [Case No. 17,584] the court held that no attention should be paid to a release of the officers of a ship from all claims and damages, given by a seaman to procure the payment of his wages. In Thomas v. Lane, cited above, there was a receipt signed by the seaman on the back of the shipping articles, in full of all demands for assault and battery and imprisonment. In

passing upon it, the court said: "To such a receipt, given upon the mere payment of wages, and without any distinct compromise, satisfaction, or compensation for trespasses, it can hardly be supposed that any court would listen as a bar to a suit of this nature. It must, under such circumstances, be treated as a paper obtained by fraud, surprise, or under advantage taken of the party's situation."

The damages claimed in the libel are $2,000. In estimating the damages to be allowed libellant, regard must be had to the condition in life and circumstances of the parties. Whitney v. Eagar, supra. The respondents are the master and mate of a sailing vessel, and have nothing so far as appears, beyond their earnings. The libellant is a seaman and a sailmaker, a native of Denmark, and under thirty years of age. On two discharges given him by a "superintendent of a mercantile marine office" at Hull, England, in 1869 and 1870, he is marked as an able-bodied seaman; "very good" as to character for "ability, capacity and conduct." The evidence shows that the bone of the upper arm was fractured, and that it has knit together, but not quite in place. The arm is yet weak, and unfits the libellant to do an able-bodied seaman's duty, but the physicians think it will be a pretty good arm in the course of a year. No expense or loss of time was incurred by libellant while on the brig, on account of the fracture. Allowing the libellant, if his arm was not injured, to be able to earn $60 a month and find himself, I think it may be safely assumed that during the current year he will not be able, on account of the condition of his arm, to earn more than $30 per month. This will be a loss to him of $360. For the actual breaking of his arm, and the anguish, pain and suffering necessarily resulting from the fracture and the beating, and the subsequent heartless neglect with which libellant was treated by the respondents, it is not so easy to determine what sum should be allowed. In these respects, what are proper damages can only be estimated in a very general way, and much must depend in each case upon the condition in life and circumstances, pecuniary and otherwise, of the parties. After careful consideration, I have concluded to allow the libellant on these accounts, $500. To these amounts something must be added by way of compensating the libellant for the expense which he has incurred in employing counsel, to maintain this suit to vindicate his rights. For this I will add $200, making in the aggregate $1,060 which the libellant is entitled to recover in any lawful money of the United States.

Affirmed on appeal in the circuit court, May 12, 1871, Sawyer, J. [Case unreported.]

[Motions to vacate the order allowing the warrant, and to set aside the proceeding and process as irregular, were made in Case No. 6,041.]